**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-01163-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-01164-ADA** |
| *Plaintiff,* | § | **CIVIL ACTION 6:20-cv-01165-ADA** |
| | § | **CIVIL ACTION 6:20-cv-01166-ADA** |
| **v.** | § | **CIVIL ACTION 6:20-cv-01167-ADA** |
| | § | **CIVIL ACTION 6:20-cv-01168-ADA** |
| **SALESFORCE.COM, INC.,** | § | **CIVIL ACTION 6:20-cv-01169-ADA** |
| *Defendant.* | § | **CIVIL ACTION 6:20-cv-01170-ADA** |
| | § | **CIVIL ACTION 6:20-cv-01171-ADA** |
| | § | **CIVIL ACTION 6:20-cv-01172-ADA** |

**<u>SALESFORCE'S REPLY CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      TERMS FROM THE '731 PATENT ..................................................................1

     A.      "calling terminal" (Cls. 1, 2, 7–11, 16–17)  / "called terminal" (Cls. 10, 11) ...............................................................................................................1

     B.      "looking up, based on at least one of a hour, minute, second and day" .................1

     C.      "changeable by at least one of the calling terminal and a network".......................2

II.      TERMS FROM THE U.S. PATENT NO 8,209,411 (THE "'411 PATENT") .................2

     A.      "messaging gateway" (Cls. 1, 3, 6–8, 10, 12, 15–18, 20).........................................2

III.      TERMS FROM THE U.S. PATENT NO 8,280,928 (THE "'928 PATENT") .................4

     A.      "directory" (Cls. 1–5, 13–16)...................................................................................4

     B.      "identifying a single initial descriptor that links a plurality of descriptors and two or more predecessor descriptors linking another single descriptor" .........6

IV.      TERMS FROM U.S. PATENT NO. 8,335,819 (THE "'819 PATENT")........................6

     A.      "scripting file" (claims 1–2, 5, 7–9, 12, 14, 16–17)................................................7

     B.      "first time request" (claims 1, 8, 16)......................................................................7

V.      TERMS FROM THE U.S. PATENT NO 8,369,827 (THE "'827 PATENT") .................8

     A.      "Subscriber Profile Repository (SPR)" (Cls. 1, 14)..............................................8

VI.      TERMS FROM THE U.S. PATENT NO 8,391,892 (THE "'892 PATENT") .................9

     A.      Order of Steps Is Limiting ......................................................................................9

VII.      TERMS FROM U.S. PATENT NO. 8,923,899 (THE "'899 PATENT").......................10

     A.      "RESTful" (claims 1, 3, 6-8, 10, 13-16)...............................................................10

     B.      "Session Initiation Protocol (SIP) request" / "SIP request" (claims 1-2, 6-9, 13-16)...............................................................................................................10

VIII.      TERMS FROM THE U.S. PATENT NO 9,088,493 (THE "'493 PATENT") .................11

     A.      "[A] login of the user with one of the more online services" (Cls. 1, 5) ..............12

     B.      The terms "determining . . . a pattern of consistent usage from the timing information" ("Dispute No. 2") and "a consistency of the determined pattern of consistent usage" ("Dispute No. 3") (Cls. 1, 5) are indefinite .............13

IX.      TERMS FROM THE U.S. PATENT NO. 9,277,060 (THE "'060 PATENT") ................14

     A.      "log(s)" (Cls. 1, 2, 3, 11, 17, 21)............................................................................14

     B.      "event" (Cls. 1, 5, 8, 9, 11, 17, 18, 21) .................................................................16

X.      TERMS FROM THE '320 PATENT ...........................................................................17

     A.      "the menu items are associated with the two or more different services"............18

B.      "presented in a manner indicating … one menu item is unavailable"...................19

CERTIFICATE OF SERVICE .......................................................................................................22

## I.    TERMS FROM THE '731 PATENT

### A.    "calling terminal" (Cls. 1, 2, 7–11, 16–17)  / "called terminal" (Cls. 10, 11)

Defining these terms is necessary because WSOU improperly maintains that they are not different, claiming that Salesforce "fashion[s] a false dichotomy between [them]."  Opp. 2, *see also id*. at 3 ("the specification describes both […] similarly."); *id*. n.3 ("both terms are merely described in the specification in an open-ended fashion.").   The claims and specification's consistent differentiated usage of the terms supports that their meanings are different.  *See* Ex. 731-1, Cl. 10, preamble:  "A method for network support for providing **caller flexibility information of a calling terminal** that is **displayed on a called terminal**" (emphasis added); *id*. Cls. 10, 11, 13, 18, 19.   WSOU fails to overcome the general presumption that the use of these different terms in the claims connotes different meanings.  *See Hill-Rom Servs., Inc. v. Matal*, 716 F. App'x 996, 1001 (Fed. Cir. 2017).  There is no logical way (and WSOU suggests none) to read this preamble if a calling terminal and called terminal are coextensive; the extrinsic dictionary definitions proffered by Salesforce further confirm this distinction.

WSOU also fails to rebut that other courts have treated "calling terminal" distinctly from "called terminal."  Opp. 3.  WSOU's claim that "calling terminal" is "readily understood" is correct on its face, but only as distinct from a called terminal – which WSOU proceeds to not only ignore, but obfuscgte.  *E.g. Mobile Telecommunications Techs., LLC v. Google Inc.*, No. 2:16-CV-2-JRG-RSP, 2016 WL 7338398, at *47 (E.D. Tex. Dec. 19, 2016); *Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc.*, No. CIV.A. 08-0157, 2008 WL 5169451, at *9 (E.D. Va. Sept. 3, 2008).

### B.    "looking up, based on at least one of a hour, minute, second and day"

WSOU misreads the prosecution history and Salesforce's arguments—i.e., that applicant disavowed that a general "appropriate time" would satisfy this construction, and made clear that the claims require lookup of a particular point of time based on an hour, minute, second or day.

1

Indeed, WSOU acknowledges the applicant argued in an attempt to overcome prior art that "'[t]ime and day' refers to a particular point in time, not to an appropriate time." Opp. 5. WSOU further confirms that "[the distinguished reference] Rhodes uses the words 'times' in the subjective sense of appropriate times, whereas the claimed invention refers to a quantifiable, objective language 'time and day.'" *Id*. Accordingly, the parties agree that this limitation is not met by the subjective specification of an appropriate time—instead a specific, objective time is required.

WSOU's remaining argument —that "Applicants were [not] disavowing particular points in time that happened to be appropriate as well"—attacks a strawman. *Id*. at 6. Pursuant to applicant's treatment of Rhodes, simply specifying an appropriate time, *e.g*., a subjective specification such as "during business hours," is not enough to satisfy this limitation. *See* Br. 34. Instead, as dictated by Applicant's arguments in overcoming the prior art, identification of a particular point in time, by at least one of a hour, minute, second and day, is required. *See id*.

### C.    "changeable by at least one of the calling terminal and a network"

Salesforce's construction reflects the correct reading of this term:  as disclosing only caller-side substitution of alternative Caller ID values. WSOU does not address the claim language or specification, or dispute (as the patent repeatedly confirms) that the substitution of Caller ID values is a caller-side functionality. *See* Ex. 731-1 Cl. 10, 1:7–9, Abstract, Fig. 2, Fig. 3, 2:24–51, 3:42–52, 3:58–4:64, 4:7–9 4:38–57. Nor does WSOU contend that the '731 patent anywhere discloses called party command entry, or any connection between the called party and the network (it does not). *See* Opp. 6–7. Salesforce is not requesting a deviation from the claim language, only a necessary clarification that values are substituted by or on behalf of a calling terminal, which would not be apparent to a lay jury especially in light of WSOU's apparent insistence on ambiguity.

### II.    TERMS FROM THE U.S. PATENT NO 8,209,411 (THE "'411 PATENT")

### A.    "messaging gateway" (Cls. 1, 3, 6–8, 10, 12, 15–18, 20)

2

WSOU argues that the claimed "first network environment" and "second network environment" can be the same network environment.  However, it is black letter law that the use of different terms in the claims necessarily connotes different meanings (i.e., "first network environment" has a different meaning to "second network environment").  Further, WSOU does not address that, to overcome the prior art, Applicant amended the claims to clarify that the content and information received by the messaging gateway is "from the first network environment" to ultimately be delivered to a device in the second network environment.  Ex. 411-5 at 2.

WSOU also does not reconcile that its arguments render superfluous the claim terms "interfacing, via a messaging gateway" and "receive, from the first network environment, content and addressing information."  *Cephalon, Inc. v. Abraxis Bioscience, LLC*, 618 F. App'x 663, 666 (Fed. Cir. 2015).  That is, if the "first network environment" and "the second network environment" were the same, the two environments would not need to interface with each other via a messaging gateway nor would a first network environment deliver content and addressing information to a gateway if it were just going to be sent back to that same network environment.  Furthermore, not once does WSOU point to a passage in the specification describing the first network environment and the second network environment being the same.

WSOU next argues that Salesforce did not cite any intrinsic evidence that the networks are "necessarily … separate."  Opp. 9.  This is false.  *See* Br. 23–25 (citing the '411 Pat, 2:49–52; 9:45–57; 10:35–39.  WSOU then again improperly relies on *Thorner* for the proposition that there is no lexicography or disclaimer in the specification that the first network environment and second network environment are different.  Under the guise of plain and ordinary construction, WSOU is advocating for a construction that allows the "first network environment" and the "second network environment" to be the same despite the well-understood meaning that a gateway is a "device that

connects two or more [separate] networks."

Next, WSOU quotes portions of the specification for the proposition that Salesforce selectively cited "embodiments" of the messaging gateway connecting two different network environments.  Opp. 13.  But each instance of "network environment" in the specification is in the context of a "fixed network" or "fixed network environment" (i.e., the "first network environment") and a separate "cellular network environment" (i.e., the "second network environment") ('411 Pat., 9:45–57; 10:35–39) leading to the inevitable conclusion that "messaging gateway" must be construed as connecting two separate networks.  *See Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017).

WSOU next claims Salesforce did not meet the standard for a "clear and unequivocal" disavowal of sending content by email to a user (Br. at 25),  arguing that the scope of a claim term can be disavowed only when the claim term is explicitly mentioned.  Opp. at 10–11.  Not only is this an incorrect statement of law,[1] WSOU does not contest that the specification is clear that the '411 patent expressly teaches away from sending content via email ('411 Pat., 1:55–2:4).

Detracting from WSOU's own arguments, WSOU adopts the Microsoft Computer Dictionary definition for "gateway" (cited by Br. 23).  This definition compels the understanding that a gateway connects two disparate networks.  Salesforce's citation to the Digital Designer's Jargon Buster definition for "gateway" is consistent with this definition.[2]

## III.   TERMS FROM THE U.S. PATENT NO 8,280,928 (THE "'928 PATENT")

### A.   "directory" (Cls. 1–5, 13–16)

WSOU's argument that the preamble *is not* limiting stands in direct contrast to its argument in Opposition to Salesforce's Motion to Dismiss that the preamble *is* limiting.  (Dkt. 25 p. 7).   In

---

[1]  *See Chicago Board Options Exchange, Inc. v. Inter'l Sec's Exchange, LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012)
[2]  "A device or program used to connect disparate computer networks."

contrast to its prior construction in opposition to Salesforce's 101 motion, WSOU argues that if a word in the preamble of an independent claim does not appear in the body of that claim, the word does not provide antecedent basis.  This is incorrect: the preamble is limiting if it "serves as antecedent basis for … limitations in the … ***dependent*** claims"—which WSOU completely ignores in its argument.  Br. 11 (emphasis added).  *Pacing Techs.*, *LLC v. Garmin International, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015).  The term "directory" in both claims 1 and 13 is limiting because it provides antecedent basis for the term "enmeshed directory" in claims 5 and 14 ("to navigate *the* enmeshed *directory* in both directions"), which are dependent claims of claims 1 and 13 respectively.  The only "enmeshed directory" to which this could refer is the "multi-level hierarchical directory structure" that is "generat[ed] in claim 1 or "creat[ed]" in claim 13.  Consistently, the '928 patent's specification demonstrates that the inventors intended to encompass a directory structure by the claims by making clear that the claims are directed to "creating a multi-level directory structure."  *See* Br. 11 (citing, e.g., the field of invention and summary).

WSOU also challenges Salesforce's proposed construction of the term "directory" itself.  However, WSOU fails to address Salesforce's authority showing that the use of the word "is" in the specification (i.e., '928 Pat., 1:25–27) is the quintessential mechanism by which a patentee acts as a lexicographer.  Instead, citing no authority, WSOU offers attorney argument that the patentee did not act as a lexicographer because the term "directory" is an adjective that does limit the "structure" in the preamble and that the use of the plural "directories" in the definition of "directory" is circular.  WSOU feigns ignorance as to how directories are organized in modern computing devices (and that a directory can, of course, include other directories) despite the "typical" ('928 Pat., 1:30–33 and 4:27–46) application of these directories and an example of a simple directory provided in the specification at 3:59–4:56.

### B.     "identifying a single initial descriptor that links a plurality of descriptors and two or more predecessor descriptors linking another single descriptor"

WSOU—arguing that the proposed first, second, third, and fourth levels of the hierarchy are "unrecited"—takes the absurd position that the claimed "***multi-level*** hierarchical structure" need not have any levels at all, contradicting the express claim language and the plain and ordinary meaning of "hierarchy."  Despite affirmatively quoting the prosecution history and that particular descriptors are in particular levels (i.e., descriptors 310-1 through 310-12 are in the level of "initial descriptor," and A5, A6, A7, A8, B4, BS, B6 and B7 are in the level of "plurality of descriptors") (Opp. 14) (shown below, left), WSOU goes on to state—in direct contravention of the file history——that no descriptor is tethered to a particular level.  Then, again, while seemingly conceding that there must be some tie between descriptors and a particular level in the hierarchy, WSOU argues for an unsupported reading of the term "linking," whereby an "initial descriptor" would be one of A5-A8 or B4-B7 and that a "plurality of descriptors" be two or more of 310-1 through 310-12.



This is squarely at odds with the prosecution history, where the applicant expressly amended claims 1 and 13 to add a fourth level to overcome the prior art that discloses three levels (Br. 16 (citing Ex. 928-6 at 13)).  Furthermore, this construction of "linking" is inconsistent with the plain language of the claim, which requires "two or more predecessor descriptors linking another single descriptor."  A2 and A3 are not linking A1 as WSOU claims.

## IV.     TERMS FROM U.S. PATENT NO. 8,335,819 (THE "'819 PATENT")

6

### A.    "scripting file" (claims 1–2, 5, 7–9, 12, 14, 16–17)

WSOU concedes  a scripting file must be written in a scripting language, but argues that the "interpreted at runtime instead of being compiled" part of Salesforce's construction departs from a POSITA's understanding of the term.  *See* Opp. 16.  In so doing, WSOU entirely ignores unrebutted evidence proffered by Salesforce demonstrating a POSITA's understanding of "scripting languages"—which has a well-established meaning as programming languages that are interpreted at runtime and not compiled into machine code.  *See* Br. 5; Dkt. 37-1, ¶ 114-16.[3]

WSOU's argument that "[t]here is simply no lexicography or disclaimer that compels Salesforce's construction"misses the mark.   Salesforce's construction rests on a POSITA's understanding as to "scripting file" at the time of the invention.  *See id.* 5-6.  And since the parties disagree about the scope of "scripting file"—*i.e.*, whether it covers files that are not interpreted at runtime—the Court should construe this term to resolve the dispute.

### B.    "first time request" (claims 1, 8, 16)

WSOU argues that the '819 patent's use of "i.e." is not definitional because example embodiments would be excluded from claim scope.  *See* Opp. 16-17.  In so doing, WSOU specifically points to the use of unique identifiers (*e.g.*, socket ID) to distinguish between *different* client-server connections.  *See* '819 patent at 8:30-48.  This disputed claim term, however, relates to distinguishing between a first and subsequent request from a client over the *same* client-server connection.  *See* Schmidt Supp. Decl. ¶ 11.  As a result, the embodiments cited by WSOU are in fact simply not within the scope of the claims.

WSOU erroneously argues that Salesforce's construction is inconsistent with the claim

---

[3]  WSOU also misconstrues Salesforce's construction of "scripting file" as a file that *only* includes scripting instructions and no other text.  *See* Opp. n.8.  On the contrary, Salesforce's construction has no express requirement that a scripting file be written *exclusively* in a scripting language, and thus would not exclude the examples in Table 2.  *See* Br. 5; Dkt. 37-1, ¶¶ 114-16.

language. Salesforce's construction requires in part that there is "no previous session information," and indeed, the claims and specification confirm that session variables (*e.g.*, session ID) comprising this session information are generated after a first time request. *See* Br. 3-4; '819 patent at . The "session **configuration** information" that WSOU highlights is a distinct system element—and claim element—that exists prior to receiving the first time request and is used to set up a client-server session. Such configuration information could include a "user ID" or "Password." *See* '819 patent at 10:14-16, 15:10-13. *See* Schmidt Supp. Decl. ¶ 12.

## V.   TERMS FROM THE U.S. PATENT NO 8,369,827 (THE "'827 PATENT")

### A.   "Subscriber Profile Repository (SPR)" (Cls. 1, 14)

The recitations of "Subscriber Profile Repository (SPR)" in the preamble are limiting because they breathe life into these claims, providing a technical framework, context, and antecedent bases for "a unique subscriber record" and "subscription identifiers." Br. At 7–9. WSOU's reliance on *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB* (Opp. at 19) is inapposite—there the preamble language found not limiting was a statement of purpose ("for rehabilitation of unilateral hearing loss"), 958 F.3d 1348, 1355 (Fed. Cir. 2020), which is dramatically different than the integral structure recited by SPR providing a technical framework and context. Notably, WSOU's position is contradicted by its own prior arguments to this Court: in opposing Salesforce's Motion to Dismiss, WSOU in fact construed SPR in the preamble as limiting, arguing in an attempt to identify patentable subject matter in the claims of the '827 patent that the claimed "method **must be 'performed' by the 'Subscriber Profile Repository**,'" Dkt. 25 at 7 (emphasis added). Indeed, WSOU argued Salesforce's § 101 argument was "untethered" without the recognition of the alleged technical improvements "particularly in the context of an improved Subscriber Profile Repository(SPR)." *Id.*

WSOU's remaining arguments—regarding use of an indefinite article preceding SPR and

that the patent somehow "disparages" the 3GPP—are similarly deficient.  An examination of the specification, in particular all sections enabling the claims, relies on the 3GPP for a disclosure of how to implement the invention.  *See* Ex. 827-1 at 3:49–54; 3:29–33; 3:49–51.  As WSOU does not attempt to rebut, a POSITA would understand SPR as defined by the 3GPP standard because of common industry use and the patent's own references.  Schmidt Decl. ¶¶ 86–92.  WSOU further alleges reference to the 3GPP should be disregarded because of alleged "disparagement."   The sections cited by WSOU identify opportunities to improve the implementation and use of a SPR as called for by the 3GPP standard.  827-1 at 1:37-62.  A POSITA would understand this and the use of industry standard language as referring to the 3GPP not pointing to something else.  Schmidt Decl. ¶¶ 87-90.  Indeed,  the '827 wholesale copies figures showing the SPR from the 3GPP specifications cited by the patent, demonstrating that the invention is an embodiment of the 3GPP SPR.  Br. At 9.  WSOU has shown no contradiction between the patent and the 3GPP, instead the patent recites an implementation of the 3GPP SPR.  *See, e.g.*, Ex. 827-1; 3:49–54; 3:29–33.

## VI.    TERMS FROM THE U.S. PATENT NO 8,391,892 (THE "'892 PATENT")

### A.    Order of Steps Is Limiting

WSOU ignores the most compelling intrinsic evidence—the clear logic of the claim language itself—which dictates the order of the "stor[ing]," "receiv[ing] a request," "allow[ing] or deny[ing] access," and "log[ging] the identity" steps; the specification and prosecution history only further reinforce this order.  *See Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021). WSOU illogically maintains that the patent does not require performance of the "store" and "receive" limitations.  Rather, according to WSOU, a "service" merely needs to be "configured to perform" these limitations.  Opp. 21.  However, without information being stored and a request being received, the remaining limitations cannot be performed at all—there would be no request to allow or deny, thus no logging of a request, access,

or denial could occur.  *Mformation*, 764 F.3d at 1398-99.

In attempting to argue that the prosecution history does not support the claimed order of steps, WSOU incorrectly asserts the "claim language [was] considerably different from what ultimately issued as claim 1." Opp. 22.  However, though the Applicant revised other aspects of the claims, the same essential steps of "storing Presence information," "receiving a request for access," "allowing or denying access," and "logging the . . . accesses, or []deni[al]" are recited in the same order.  *Cf.* Ex. 892-2 at 3 with 892-1 at 5:60–6:15.  Further, the same logical ordering applies to the claim as written during prosecution as to what was issued and in the same way.

## VII.   TERMS FROM U.S. PATENT NO. 8,923,899 (THE "'899 PATENT")

### A.    "RESTful" (claims 1, 3, 6-8, 10, 13-16)

WSOU's arguments that the Court need not construe "RESTful" are unsupported and incorrect.  WSOU argues that since "RESTful" appears in the title, the Abstract, and "over sixty times" within the '899 patent specification without an explicit definition, "[t]he Court need not construe this term."  *See* Opp. 23-24.  But WSOU fails to cite any authority whatsoever for its "frequent usage theory," let alone a case like this one, where the claim term is based on an acronym introduced in a Computer Science Ph.D. dissertation, and thus unfamiliar to a lay jury (who would almost certainly have a different understanding of the term "REST" than is intended here).  For the same reason, WSOU's argument that the prosecution history supports not construing "RESTful" is without merit.  Indeed, the rejection reflects that the Examiner himself, an experienced technical person in the field, did not even understand the term initially.

### B.    "Session Initiation Protocol (SIP) request" / "SIP request" (claims 1-2, 6-9, 13-16)

WSOU's  argument that no construction is necessary because "the parties do not dispute that 'Session Initiation Protocol (SIP) request' and 'SIP request' refer to the same thing" is

inapposite, because the parties' dispute is not whether these two terms mean the same thing (they do), it is about their *scope*; since the parties disagree about their scope, the Court must construe this term to resolve the dispute.   *See Eon*, 815 F.3d at 1319.   Opp. 25-26. WSOU's argument that Salesforce's construction was erroneous because it relied too much on expert testimony and not enough on intrinsic evidence is meritless: Salesforce did not rely solely on the '899 patent's acknowledgement that "SIP" refers to the "Session Initiation Protocol." Salesforce also cited the patent's description of how the claimed "conversion system" receives a RESTful operation and converts it into a SIP message to support its construction.  *See* Br. 44; Dkt. 37-51 at 7:5-10, 59-61.   Furthermore, since the '899 patent specification did not recite "Session Initiation Protocol (SIP) request" / "SIP request," let alone define them, it is useful and appropriate for the Court to refer to such evidence.  *See Engineered Arresting Sys. Corp. v. Runway Safe LLC*, Case No. 1:15-CV-546-LY, 2016 WL 5107083, at *6 (W.D. Tex. Sept. 19, 2016).

Finally, WSOU's argument that Salesforce "attempts to equate the term 'SIP MESSAGE' in the specification to the claim term 'Session Initiation Protocol (SIP) request'" simply ignores the language of Salesforce's construction.  I.e., Salesforce does not construe "Session Initiation Protocol (SIP) request" as a "SIP message," but rather a "message conforming to the request message format of the Session Initiation Protocol specification as set forth in RFC 3261 published by the Internet Engineering Task Force."  In its brief, Salesforce did nothing more than state that the "SIP MESSAGE" recited in an embodiment "corresponds to the claimed 'Session Initiation Protocol (SIP) request.'"  Br. 44.  Put differently, the referenced "SIP MESSAGE" was an example of a "Session Initiation Protocol (SIP) request."  But this is different than asserting that every "SIP MESSAGE" is a "Session Initiation Protocol (SIP) request."

## VIII.   TERMS FROM THE U.S. PATENT NO 9,088,493 (THE "'493 PATENT")

11

### A.       "[A] login of the user with one of the more online services" (Cls. 1, 5)

The parties dispute scope of the claim necessitating construction, as WSOU's so-called "plain and ordinary" boundless construction would encompass *any and all* browsing, idling, or accessing of the one or more online services, by pretty much anyone, and "expand the scope of the claim far beyond any-thing described in the specification." *Wisconsin Alumni Research Foundation v. Apple, Inc.*, 905 F.3d 1341, 1351 (Fed. Cir. 2018),

Contrary to WSOU's argument that the claim language is agnostic about Salesforce's construction, the claims are clear that: (1) there is "a user of the one or more online service"; (2) there is "timing information related to usage by the user"; and (3) "the timing information is associated with a login of the user with one of the one or more online services." '493 Pat., cls. 1, 5. For these limitations to exist as recited in the claims, there needs to be a *how* and *why* the user uses the online service which is associated with the login to generate the usage information. Additionally, the claims start with "a request *from at least one of one or more online services*," supporting Salesforce's proposed article "an online service." *Id.*; *see also*, Fig. 1, 3:60–61; 4:10.

In attempting criticize Salesforce's specification cites, WSOU notably fails to address the portion of the specification which connects "login" with user registration and authentication, in support of Salesforce's construction. '493 Pat., 7:12–35, 8:42–46. And the only portion that WSOU does cite supports Salesforce: for there to be timing information "a login and logout time," "a login time and a duration of the user's access," "a login time," there needs to be "an entering of user information in order to access an online service" for the timing information to start. *Id.* at 4:7–8; *see also id.* at 4:10 ("Additionally, the user may register and access another online service 103*n*."). Contrary to WSOU's argument, the specific sequence of events is not extraneous, but rather inherent in the language and scope of the claims and the specification. WSOU also completely ignores the extrinsic evidence offered by Salesforce. Br. 17–18.

**B.**     **The terms "determining . . . a pattern of consistent usage from the timing information" ("Dispute No. 2") and "a consistency of the determined pattern of consistent usage" ("Dispute No. 3") (Cls. 1, 5) are indefinite**

Aside from proposing a plain and ordinary meaning construction, WSOU does not appear to disagree with Salesforce that "pattern of consistent usage" is a coined term, which necessarily requires the consideration of the intrinsic record to determine whether its scope has objective boundaries.  Opp. 28–29; Br. 18–19.  WSOU's Opposition confirms that Salesforce has meet the clear and convincing burden to prove that this claim is indefinite.  ***First***, WSOU cites to the ***same exact portion of the specification*** as Dr. Schmidt, who has opined that these citations "fails to provide sufficient guidance to a POSITA as to what may be objective boundaries."  Schmidt Decl., ¶ 105, *see also* Mot. at 19-20.  ***Second***, WSOU alleges that "the amount of variation in timing information over a certain period of time" ('493 Pat., 4:48-50) is a "mathematical expression [which] returns a value for consistency .… *whatever the amount or time period may be*."  Opp. at 29 (emphasis in original).  This attorney argument is wrong on its face – the boundless and ambiguous nature of both the amount of variation and of the time period in fact underscores that this coined term has no objective boundaries.   ***Third,*** WSOU's argument is inherently contradictory.   WSOU apparently contends that the phrases in Salesforce's alternative constructions "free from variation to a certain degree" for dispute no. 2 and "within a certain tolerance range" are indefinite terms of degree.  Opp. at 29-30.  However, the portion of the specification WSOU cites is even more uncertain that unbound that Salesforce's proposals:  "the amount of variation in timing information over a certain period of time."  *Id.* at 29.

The rest of WSOU's arguments make clear that WSOU has no idea how to fashion definite boundaries for these two disputed terms.  For dispute no. 2, WSOU does not explain how the "wherein" clause bears on the "consistent" term of degree.  Opp. at 28-29.  In the phrase "a consistent jam, wherein the jam is made from berries," the "wherein" clause does not provide

13

boundaries for "consistent," and neither does the portion of the claims WSOU cites here.  WSOU also does not explain what it means for "a pattern of consistent usage" to reflect ***both*** (1) "usage of at least one of the one or more online services" and (2) "transmission availability of a message." WSOU's argument violates claim construction cannons, since WSOU appears to say that the first "usage" in the "[determining/determine] …" phrase includes both the second "usage" and "transmission." *See PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007).

Similar lack of logic applies to WSOU's claim-based argument to dispute no. 3.  Just as the antecedent basis in "gooeyness of the consistent jam" does not provide objective boundaries for the term "gooeyness," the recited "consistency" is not bound by "the determined pattern of consistent usage" (even setting aside that this term too is also unlimited and unclear in scope). Opp. at 28-29.  WSOU's antecedent based argument also does not address the cannon of claim construction that the recited "the determined pattern of consistent usage" and "a consistency of the determined pattern of consistent usage" need to have distinct meaning.  *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co*., 811 F.3d 1334, 1340 (Fed. Cir. 2016).

## IX.    TERMS FROM THE U.S. PATENT NO. 9,277,060 (THE "'060 PATENT")

### A.    "log(s)" (Cls. 1, 2, 3, 11, 17, 21)

WSOU's formulaic position on lexicography is incorrect as a matter of law.  Opp. 32–33; *see Trs. of Columbia*, 811 F.3d at 1364; *Astrazeneca AB v. Mut. Pharm. Co*., 384 F.3d 1333, 1339 (Fed. Cir. 2004).  Here, the patentee acted as a lexicographer in stating that "logs 24 provide a history of prior communications and attempted communications.  ***Each log is a logically or physically separate data store associated with a different communication event type***.  A log 24 associates a record of events that involve an identifier for each of a plurality of identifiers."  '060 Pat., 3:2–7.  *See Scripps Rsch. Inst. v. Illumina, Inc.,* 782 F. App'x 1018, 1022 (Fed. Cir. 2019) (holding that use of the word "is" is definitional lexicography).  Figure 1 also supports Salesforce's

construction by showing that each log (a reference numeral "24" cell) is a "separate data store" in the memory (which stores "a history of prior communications and attempted communications") with a computer program (which allows for logs to be "automatically updated without user input"). The portion of the specification cited by WSOU does not provide an alternative embodiment or example of logs; it is generic catch-all language at the very end of a specification with no tie to the claim term at issue, and thus has no impact on the express definitional statement in the specification.  Opp. 32; *see, e.g.*, *SandBox Logistics LLC v. Proppant Express Invs. LLC*,  813 Fed. App'x. 548, 553 n.8 (Fed. Cir. 2020) (boilerplate at the end of a specification does not support construing the claims beyond the embodiments described).

Second, WSOU's criticism of Salesforce's disavowal of claim scope is contrary to the prosecution history.  In arguing its invention was novel over this prior art, applicant distinguished its invention as novel because it "***update[s] automatically without user input***, e.g., personal data of the originator of a phone call or communication," unlike the prior art which would that "the user allows by using a keyboard 24 (or voice dialog) to update information."  *Id.* (emphasis in original). The "particular feature" no longer included in the claims of the '060 patent based on this disavowal is manual user updates of the logs. Therefore, "log" has to mean that it is "automatically updated without user input" to respect the applicant's clear disavowal of scope.  *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1378 (Fed. Cir. 2021) (finding disavowal based on adding limitation during prosecution and resulting in a disclaimer of claim scope).

WSOU's argument about the claims having the "updating, automatically without user input" limitation in connection with to the "the data associated with the included identifier" is a strawman.  Opp. 33.  Read in full, the language of the claims is clear that "logs" ***contain*** the "the data associated with the included identifier," and, consequently, are also automatically updated.

*See* '060 Pat, cls. 1–3.  This is supported by the specification.  *See* '060 Pat, 4:39–40 ("The processor 12 then updates the logs 24 of historic communication data so that the incoming call 8 is recorded in one or more of the logs 24."); 6:40–46; Fig. 1.  WSOU is "not entitled to a claim construction divorced from the context of the written description and prosecution history." *Nystrom v. TREX Co., Inc*., 424 F.3d 1136, 1144–45 (Fed. Cir. 2005).

**B.  "event" (Cls. 1, 5, 8, 9, 11, 17, 18, 21)**

**First,** WSOU's arguments about the applicability of the *Thorner* exceptions in light of the intrinsic record providing a definition of "event" is not correct.  Opp. 30; *see Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016); *InterDigital Commc'ns, Inc. v. U.S. Int'l Trade Comm'n*, 601 F. App'x 972, 977–78 (Fed. Cir. 2015).  **Second,** WSOU's statement about Salesforce's alleged failure to link the disputed term to the intrinsic records are incorrect both as a matter of law and in practice.  Here, Salesforce explained the context of this patent to illustrate why the proper construction for "event" as used in the claims is "communication associated with an identifier."  *See Trs. of Columbia*, at 1363.

**Second,** WSOU's illustration of claim 1 actually supports Salesforce's argument by making it clear that the "event" takes place on "a communication device" and is related to a communication, namely, to "an incoming telephone call."  '060 Pat., cl. 1; cl. 17 (same); cl. 11 (similarly connecting "event" on a "communication device" with "transfer of a message").  WSOU attacks a strawman, since Salesforce does not contend that "all 'events' [are] one and the same with 'communications.'"  Opp. 31.  Salesforce instead argues that the intrinsic evidence shows the "event" as used in the claims means "communication associated with an identifier." Br. 26–27.

**Third,** WSOU's specification citations are cherry-picked elisions that omit relevant, related language from the specification.  For example, "an appointment in a calendar" event, according to a specification, is still a "communication associated with an identifier" because it

"includes within the text of the appointment an identifier. An identifier may be recognised within the text of a received email by parsing the text and making a comparison with a filter that recognises an identifier format." '060 Pat., 4:9-13.  WSOU's other cited specification example actually supports Salesforce's construction:  6:11-14 states that the alert message shows the last communication regardless of the type of event., *i.e.*, "communication associated with an identifier. In the cited list of examples at 6:14-19, each emphasized example is a "communication with an associated identifier." *See also* '060 Pat., Fig. 3A.  Tellingly, every single example WSOU cites as an "event" is a "communication with an associated identifier."

**Fourth,** WSOU's argument that "event" "should be accorded the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" (Opp. at 32) ignores the black letter law that a POSITA would look at the term ***in the context of the specification***. *See Philips*, 415 F.3d at 1313 Here, based on the intrinsic record contends that, based on the intrinsic records, this meaning is "communication with an associated identifier."  It is telling that WSOU leaves it open-ended what it contends "event" encompasses in these claims while criticizing Salesforce's arguments against "conventional meaning."  Merriam-Webster defines "event" as "something (especially something important or notable) that happens."  Ex. 060-7 (https://www.merriam-webster.com/dictionary/event).  That is not what the '060 patent means when using this term.  WSOU cannot use a strawman to hide from the fact that the ordinary meaning of a claim term is not "the meaning of the term in the abstract," but the meaning in the context of the specification.  *See St. Isidore Rsch., LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *9 (E.D. Tex. Sept. 19, 2016) (construing "event" as "verification request" based on the intrinsic record).

## X.    **TERMS FROM THE '320 PATENT**

A.      "the menu items are associated with the two or more different services"

WSOU's Response confirms that construction of this term is necessary to inform a lay jury of the scope of this term, as WSOU intends to take advantage of potential grammatical ambiguity to improperly argue that each menu item does not need to be associated with at least two different services, as dictated by the claims, specification and prosecution history. Claim 1 recites "one menu item associated with the two or more different services."  Ex. 320-1.  Thus, the plain language of the claims indicates that a single menu item is associated with two or more different services.  *See Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011) (claim describing "accessing a bit line" to activate "a number of memory cells" properly construed as "a single bit line activates multiple memory cells.").   WSOU's position to the contrary is baseless—the plural usage elsewhere in the claims of "menu items associated with [...] services" conforms with Salesforce's construction, and does not alter the singular/plural grammar of the term "one menu item/two or more []services."  *See* Opp. 34.

WSOU concedes that the specification discloses that single menu items are associated with multiple services, but attempting to avoid the clear implication of the claim language, argues that this is  merely an example applying to only "some" menu items.  *Id*. at 34-35, citing '320 patent at 4:66-5:6 ("[s]ome selected menu items may be utilized to cause initiation of ***one of the services corresponding to the menu item***.") (emphasis added).   However, WSOU misreads the embodiment—the determiner "some" modifies the initiation of services, not the use of plural "services" corresponding to the single item.  WSOU's reading cannot be squared with the language of the claims, and would render superfluous this term and the portions of the specification addressing it; WSOU points to nothing suggesting that an individual menu item may be associated with less than two services.  *Id*.  WSOU also makes no attempt to interpret the context set forth in specification—that each menu item is associated with at least two different services, such as

18

different versions of a music service with varied access to copyrighted or licensed content based on location.  *See* Br. 41.

WSOU acknowledges, as it must, that Applicant argued to distinguish prior art: "the primary reference to ***Logan et al. does not describe at least one menu item associated with two or more different services***."  Opp. 37, citing Ex. 320-7 at 8-9 (emphasis added).  In an about-face from its immediately preceding argument that consistent usage of "menu items associated with two or more different services" across the claims implies a consistent meaning throughout (Opp. 34), WSOU here argues "usage" has a different meaning in each clause.  *See* Opp. 37.  WSOU cannot credibly advance both positions simultaneously.  The Applicant contended as a point of novelty that a single menu item is associated with two or more different services.  *Id.*, citing Ex. 320-7 at 8-9.   This disclaimer applies equally to all terms of Claims 1 and 10 describing the association of single menu items with plural services.

### B. "presented in a manner indicating … one menu item is unavailable"

The Court should reject WSOU's attempts to read this claim as satisfied by simply removing a menu item, which is at odds with the claims, specification, and file history.  WSOU is incorrect to argue (Opp. 38) that Salesforce's only ground for this construction is *Meade Instruments Corp. v. Yamcon, Inc.*, 197 F. App'x 929, 932 (Fed. Cir. 2006).  That decision is instructive, as it held that an item is not 'presented' if it is not viewable, in reliance on the Webster's dictionary definition of "present" as "[t]o exhibit or offer to view").  *Id*.  However, the plain language of the claim itself shows that simply removing a menu item cannot not satisfy this limitation, as a removed item is not "presented" to the user.

The definition of "ghosting" in the specification applies to this term.  Opp. 38-39.  The original specification disclosed and defined "ghosting" as "presenting a menu item to show that the menu item is associated with the UE 101 (e.g., installed), but unavailable (e.g., non-

selectable)," and characterized it as an optional embodiment.  Ex. 320-4 at 17.  The original claims did not mention ghosting or contain this disputed term.  *Id*. 32-35.  To avoid rejections over prior art, the Applicant later amended the claims to include this term—"presented in a manner indicating that the at least one menu item is unavailable,"—which very closely tracks the specification's definition of "ghosting"  Ex. 320-5 at 2.  WSOU does not address this equivalent language, instead countering that the specification describes "ghosting" as optional. Opp. 39.  But it does not matter that the specification initially submitted with the original application described "ghosting" as optional (Opp. 39)—the claim language that Applicant added later (and which is embodied in this limitation) clearly makes "present[ation] in a manner indicating that the at least one menu item is unavailable" mandatory, and the claim language controls.  *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1137 (Fed. Cir. 2011).  It also does not matter that "ghosting" is not recited in the claims, because the definition of ghosting and the language of this term are so closely related,  the ghosting definition applies to this term.  *See Network Com., Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1360 (Fed. Cir. 2005).

WSOU itself screenshots and highlights Applicant's critical disavowal—that "***Jheng***… ***does not explicitly teach that [a] menu item […] is presented in a manner indicating that [it] is unavailable*** […] at a location indicated by location information associated with the device."  Opp. 40, citing Ex. 320-7 at 9 (emphasis added).  However, WSOU attempts to avoid this disavowal by arguing it is tied to the last clause of the above quote ("at a location indicated by location information…").  WSOU does not explain how this would change the scope of the disavowal— whether linked to location or not, the claim requires presentation in a manner indicating unavailability, which, per the Applicant, is not satisfied where a menu item is simply disabled or removed.  *See id*.

20

DATED: November 17, 2021                    Respectfully submitted,

/s/ Scott L. Cole
Scott L. Cole
scottcole@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
201 West 5th Street
11th Floor
Austin, TX 78701
Telephone: (737) 667-6104

Kevin P.B. Johnson
kevinjohnson@quinnemanuel.com
Todd Briggs
toddbriggs@quinnemanuel.com
Ray R. Zado
rayzado@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Sam Stake
samstake@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, Floor 22,
San Francisco CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendant salesforce.com, inc.*

## **<u>CERTIFICATE OF SERVICE</u>**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on November 17, 2021, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

Dated:  November 17, 2021          */s/ Scott Cole*
                                                    Scott Cole